RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

GINA V. BURT,

*Plaintiff-Appellee,*

*v.*

PLAYTIKA, LTD.; PLAYTIKA HOLDING CORP.,

*Defendants-Appellants.*

No. 25-5038

─────────────────

SANDRA TUCKER DUCKWORTH,

*Plaintiff-Appellee,*

*v.*

YELLOW SOCIAL INTERACTIVE, LTD.,

*Defendant-Appellant.*

No. 25-5039

─────────────────

LAUREN EWING,

*Plaintiff-Appellee,*

*v.*

VGW HOLDINGS LTD.; VGW HOLDINGS US, INC.; VGW US, INC.; VGW LUCKYLAND, INC.,

*Defendants-Appellants.*

No. 25-5040

─────────────────

JENNIFER LYNN BEAN,

*Plaintiff-Appellee,*

*v.*

ARISTOCRAT LEISURE, LTD.; ARISTOCRAT TECHNOLOGIES, INC.; PRODUCT MADNESS, INC.,

*Defendants-Appellants.*

No. 25-5042

Appeals from the United States District Court for the Eastern District of Tennessee at Winchester.
Nos. 23-cv-00055, 23-cv-00058, 23-cv-00062, 23-cv-00061—Curtis L. Collier, District Judge.

Argued:  February 25, 2025

Decided and Filed:  March 16, 2025

Before:  GILMAN, GIBBONS, and THAPAR, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Robert M. Loeb, ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington, D.C., for the Playtika, Yellow Social Interactive, and VGW Appellants.  Sarah E. Harrington, COVINGTON & BURLING LLP, Washington, D.C., for the Aristocrat Leisure Appellants. John E. Norris, DAVIS & NORRIS, LLP, Birmingham, Alabama, for Appellees.  **ON BRIEF:** Robert M. Loeb, Behnam Dayanim, Abigail Colella, ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington, D.C., Nathan L. Kinard, Anthony A. Jackson, CHAMBLISS, BAHNER & STOPHEL, P.C., Chattanooga, Tennessee, for the Playtika and VGW Appellants.  Sarah E. Harrington, Gary Rubman, Nathan Lange, Sameer Aggarwal, Rachel E. Grossman, Emma Keteltas Graham, COVINGTON & BURLING LLP, Washington, D.C., Robb S. Harvey, HOLLAND & KNIGHT LLP, Nashville, Tennessee, Lindsey Barnhart, COVINGTON & BURLING LLP, Palo Alto, California, COVINGTON & BURLING LLP, Washington, D.C., for the Aristocrat Leisure Appellants.  John E. Norris, Wesley W. Barnett, Dargan M. Ware, DAVIS & NORRIS, LLP, Birmingham, Alabama, for Appellees.  Nathan L. Kinard, William M. Gantz, DUANE MORRIS LLP, Boston, Massachusetts, Anthony A. Jackson, CHAMBLISS, BAHNER & STOPHEL, P.C., Chattanooga, Tennessee, Drew Dorner, DUANE MORRIS LLP, Washington, D.C., for Appellant Yellow Social Interactive.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge.  Plaintiff Gina Burt sued defendants Playtika, Ltd. and Playtika Holding Corporation (collectively, "Playtika") in Tennessee state court, seeking to recover alleged gambling losses incurred by Tennessee residents who played Playtika's online games.[1]   Playtika removed the case to federal court, invoking federal

---

[1]This appeal involves four consolidated actions with different plaintiffs and defendants.  *See Duckworth v. Yellow Soc. Interactive, Ltd.*, No. 25-5039; *Ewing v. VGW Holdings Ltd.*, No. 25-5040; *Bean v. Aristocrat Leisure, Ltd.*, No. 25-5042.  All four plaintiffs raise substantially the same allegations under Tennessee Code Ann. § 29-19-105 against various social gaming companies, and all four actions were removed under CAFA and the diversity

jurisdiction under the Class Action Fairness Act (CAFA), Pub. L. No. 109-2, 119 Stat. 4 (2005), and traditional diversity jurisdiction under 28 U.S.C. § 1332.  The district court entered an order remanding the case to state court, determining that it lacked jurisdiction because (1) Burt's suit was not a "class action" under CAFA, and (2) the losses of the Tennessee players could not be aggregated for amount in controversy purposes.  Playtika appeals the district court's remand order under CAFA's expedited removal appeal provision, 28 U.S.C. § 1453(c).

We do not reach the statutory removal issues, however, because Burt lacks Article III standing to proceed in federal court.  We therefore affirm the district court's remand order.

## I.

Gambling has long been illegal in Tennessee.  A person gambles when she "risk[s] anything of value for a profit whose return is to any degree contingent on chance, or any games of chance associated with casinos, including but not limited to, slot machines, roulette wheels and the like."  Tenn. Code Ann. § 39-17-501(2).

At common law, gambling losses were not recoverable.  *See Nichol v. Batton*, 11 Tenn. 469, 474 (Tenn. Err. & App. 1832).  But in 1799, the Tennessee legislature created a cause of action for any person who lost money on a game or wager.  Applicability of Statute of Anne Provisions Regarding Gambling, Tenn. Op. Att'y Gen. No. 04-046, 2004 WL 789813, at *1–2 (Mar. 18, 2004).  Under the statute, any person who suffered a gambling loss could sue and recover from the winner within 90 days of the loss.  *Id.* at *2 n.2.

In 1858, Tennessee expanded the rights under the Act of 1799.  The statute still allowed a gambler to sue to recover her own gambling loss.  *See* Tenn. Code Ann. § 29-19-104.  But if the gambler did not timely sue, the statute provided that:

> Any other person may, after the expiration of the ninety (90) days, and within twelve (12) months thereafter, recover the amount of such money, thing, or its value, by action for the use of the spouse; or, if no spouse, the child or children; and, if no child or children, the next of kin of the loser.

---

jurisdiction statute.  In this opinion, we refer only to Burt's case, but we affirm the district court's order remanding all four actions to state court for the reasons given here.

*Id.* § 29-19-105.

Expansive gambling loss statutes, like Tennessee's, were intended to prevent a gambler "from abusing the vice and exceeding limits which bring harm to the gambler and his or her family." *Berkebile v. Outen*, 426 S.E.2d 760, 763 (S.C. 1993). The statutes might have also been intended to supplement states' general anti-gambling provisions during a time when local governments' enforcement powers were much weaker. *See Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir.1997) ("The [Illinois] Loss Recovery Act was intended to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism."); *Salomon v. Taft Broad. Co.*, 475 N.E.2d 1292, 1298 (Ohio Ct. App. 1984) (observing that gambling loss statute was "born in a vanished era where the absence of an organized police authority to enforce criminal statutes made necessary the use of such rewards for informers").

Although the state's response to gambling has largely stayed the same, the way people gamble has changed considerably. Today, modern technology allows anyone with a smartphone, tablet, or computer to "gamble" at any time and from any location from which the player's device can receive a signal.[2]

Playtika develops and markets games that can be played online or on a mobile application. Its products include virtual slot machines, card games, and other casino-themed "games of chance." These games generally follow a similar formula: The player starts the game with a few virtual coins. The player then uses the coins to play the game—for example, to "spin" the reel on the virtual slot machine. If the player loses the game, she loses the wagered coins; if she wins the game, she gains additional coins, allowing her to continue playing. Once the player runs out of coins, she must spend actual money to buy more virtual coins to continue playing the game with full functionality.

Many Tennessee residents play Playtika's games of chance and have bought additional playing time. Believing that these players incurred illegal gambling losses, Burt sued Playtika under § 29-19-105 in Tennessee state court. She seeks to recover "all sums paid by Tennessee

---

[2]The legality of these online games—in particular, whether the player or company "risk[s] anything of value for a profit whose return is to any degree contingent on chance"—appears to be unsettled under Tennessee law. Tenn. Code Ann. § 39-17-501(2).

residents to Playtika in its online gambling games" during the relevant statutory period.  DE 1-1, Compl., Page ID 22.  She does not, however, seek recovery for any "Tennessee resident who lost $75,000 or more" by playing Playtika's online games.  *Id.* at 22–23.

Playtika removed the case to federal court, asserting both CAFA jurisdiction and traditional diversity jurisdiction.  Burt moved to remand the case to state court.  The district court granted Burt's motion, concluding that (1) the suit was not removable under CAFA because it was not a "class action," and (2) the court lacked traditional diversity jurisdiction because the players' losses could not be aggregated.

Playtika petitioned this court for permission to appeal the district court's remand, which we granted.

## II.

The parties debate whether this case belongs in federal court.  Their disagreement centers on whether the district court has subject matter jurisdiction over Burt's suit under CAFA or traditional diversity jurisdiction.  But subject matter jurisdiction also requires that the plaintiff have Article III standing to assert her claims in federal court.  *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012) ("Article III of the Constitution gives federal courts subject matter jurisdiction over actual cases or controversies, neither of which exists unless a plaintiff establishes his standing to sue.").

The district court did not analyze whether Burt had standing.  On appeal, Burt asserts, in passing, that she has standing, while Playtika does not address the issue in its briefs.  Nonetheless, we have an independent duty to ensure that we do not exceed the bounds of our jurisdiction and therefore "must raise and decide jurisdictional questions that the parties either overlook or elect not to press."  *Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

Standing consists of three elements:  (1) an injury in fact that is (2) fairly traceable to the defendant's challenged conduct, and (3) likely to be redressed by a favorable judicial decision.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Without the plaintiff suffering an injury that the defendant caused and the

court can remedy, there is no case or controversy for the federal court to resolve. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

The problem with Burt's standing is apparent:  she does not allege that she personally suffered any gambling loss.  Indeed, the only allegation about Burt in the complaint is that she resides in Tennessee.  Burt seeks to recover gambling losses "for the benefit of the family of Tennesseans who have lost money to Playika in illegal gambling."  DE 1-1, Compl., Page ID 20–21.  The plain language of § 29-19-105 appears to allow her to do so.  *See* Tenn. Code Ann. § 29-19-105.  But a plaintiff does not automatically satisfy the injury-in-fact requirement "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *TransUnion*, 594 U.S. at 426 (quoting *Spokeo*, 578 U.S. at 341).  The plaintiff must "have been *concretely harmed* by a defendant's statutory violation [to] sue that private defendant over that violation in federal court."  *Id.* at 427.  Because Burt did not incur a gambling loss herself, she did not suffer an injury in fact and therefore lacks standing.

Burt nonetheless asserts that she has standing because § 29-19-105 is a qui tam statute, assigning her the right to sue on behalf of the family members.  Playtika, on the other hand, questions whether § 29-19-105 confers qui tam standing.  Playtika would have us reach the statutory subject matter jurisdictional questions and leave for another day the issue of whether Burt has Article III standing.  We consider each argument in turn.

### A.

A qui tam statute allows an individual to bring a claim on behalf of the government to redress an injury to the government.  *Stalley v. Methodist Healthcare*, 517 F.3d 911, 916–17 (6th Cir. 2008).  In a qui tam action, the plaintiff has standing because she is the assignee of the government's claim against the defendant.  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000).  According to Burt, § 29-19-105 is a qui tam statute because it assigns the right to recover certain gambling losses to "any other person," including an individual who neither suffered a gambling loss nor bears a relation to someone who did.

Burt's argument falls short for at least three reasons.  First, a qui tam action involves more than the mere assignment of rights.  It is intended to redress an injury to the *government*.  It

is the *government's* injury, then, that confers standing upon the plaintiff, not a private third party. Section 29-19-105 does nothing to redress an alleged injury to the state. It allows a suit to recover a gambling loss "for the use of the spouse; or, if no spouse, the child or children; and, if no child or children, the next of kin of the loser." Tenn. Code Ann. § 29-19-105. Thus, a plaintiff who sues under § 29-19-105 seeks to redress an injury to a private, third party—the spouse, child, or other relative of an aggrieved player—not the state. Because § 29-19-105 "contains no language requiring that the private plaintiff bring the action on behalf of" the state, it is likely not a qui tam statute. *Stalley*, 517 F.3d at 918.

But even if a qui tam statute could include an assignment of rights to a private third party, no such assignment has been alleged here. An assignor cannot, of course, assign a right without consenting to the transfer. *See Action Chiropractic Clinic, LLC v. Hyler*, 467 S.W.3d 409, 411 (Tenn. 2015). And Burt does not allege that any of the family members agreed to such a transfer—or even know that Burt is suing on their behalf.[3]  *See Braden v. ARB Gaming, LLC*, No. 24-CV-00762, 2024 WL 4648002, *3 (M.D. Tenn. Oct. 31, 2024) ("[A] right of action does not create a forced assignment by others who may want to bring their own suit.").

Second, a qui tam statute usually requires that the plaintiff share part of the recovery with the government. *See Stalley*, 517 F.3d at 918; *see also Qui Tam Action*, Black's Law Dictionary (12th ed. 2024) (defining qui tam action as "[a]n action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive"). To be sure, § 29-19-105 does not detail how a successful plaintiff should apportion a recovery. But it is clear on one thing: the recovery is "for the use of" the family members. Tenn. Code Ann. § 29-19-105. Unlike a typical qui tam statute, the government receives no share of the recovery. *See id.*; *cf.* 31 U.S.C. § 3730(d)(1), (2) (providing that False Claims Act relator receive not more than 25% of the bounty in a government-

---

[3]For that reason, *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269 (2008) is also not on point. In *Sprint*, the Supreme Court held that an assignee has standing to assert the injury in fact of the assignor. *Id.* at 286. The assignment in *Sprint* arose out of an express agreement under which "each payphone operator 'assigns, transfers and sets over' to the aggregator 'all rights, title and interest' in dial-around compensation claims." *Id.* Burt does not allege that such an agreement, showing that the family members manifested an intent to assign their right to sue, exists here. *See Herr v. U.S. Forest Serv.*, 803 F.3d 809, 821 (6th Cir. 2015).

prosecuted case, and 25–30% of the bounty in a case the government declines to prosecute, with the government receiving the remainder).

Third, a qui tam statute usually provides procedural safeguards to ensure that the government retains some control of the action. *Stalley*, 517 F.3d at 917–18; *see, e.g.*, 31 U.S.C. § 3730(b)–(f) (providing that (1) the relator must serve the complaint and a written disclosure of material evidence on the United States before service to the defendant; (2) the relator must file the complaint under seal while the government conducts an investigation; (3) the government may intervene if it so elects; (4) the government may settle the case over the objections of the relator; and (5) the government must give consent before the case can be dismissed). No such procedural safeguards are present in § 29-19-105, and thus nothing in the statute suggests that the government is the real party in interest.

Because § 29-19-105 is not a qui tam statute, Burt lacks qui tam standing. *See Duncan v. Liberty Mut. Ins.*, 854 F. App'x 652, 666 (6th Cir. 2021) (declining to extend "qui-tam-like standing under a non-qui tam statute").

## B.

Playtika, for its part, does not argue that Burt has standing for her underlying claims. Playtika argues instead that Burt has standing to challenge the case's removal to federal court, allowing us to decide the statutory removal issues before remanding the case to the district court to consider Article III standing in the first instance. Playtika relies on the Supreme Court's decision in *International Primate Protection League v. Administrators of Tulane Educational Fund*, which recognized a plaintiff's standing to challenge removal. 500 U.S. 72 (1991).

A brief summary of *International Primate* shows why it does not suffice to keep Burt's case in federal court. In *International Primate*, an animal rights group filed suit in state court, seeking to enjoin the National Institute of Health (NIH) from conducting experiments on monkeys and to obtain custody of them. *Id.* at 74–75. NIH removed the case to federal court under 28 U.S.C. § 1442(a)(1), which authorizes removal of state suits by certain federal defendants. *Id.* at 75. The district court then granted a temporary restraining order, barring NIH from carrying out its plan to euthanize some of the monkeys. *Id.* at 75–76. On appeal, NIH

argued that the plaintiffs lacked standing to seek protection of the monkeys; the plaintiffs, on the other hand, argued that removal was improper because § 1442(a)(1) allows only federal officers, not federal agencies like NIH, to remove cases to federal court.  *Id.* at 76.  The Fifth Circuit agreed with NIH that the plaintiffs lacked Article III standing.  But rather than remand the action to state court, the Fifth Circuit dismissed the case because, in its view, removal had been proper under § 1442(a)(1).  *Id.*

The Supreme Court granted certiorari to decide whether § 1442(a)(1) permits removal by federal agencies.  *Id.*  It expressly declined to review, however, whether the plaintiffs had standing for their state-law claims.  *Id.* at 78 n.3 ("The question whether the Court of Appeals erred in applying Article III's standing requirements to these claims is not before us.").  Before reviewing the merits, the Supreme Court addressed whether it had jurisdiction to consider the removal issue, given the Fifth Circuit's ruling that the plaintiffs lacked standing.  *Id.* at 76–77.  The Supreme Court held that the plaintiffs had standing to challenge the removal of the case to federal court because they had "lost the right to sue in [state] court—the forum of their choice."  *Id.* at 77.  The Fifth Circuit's standing ruling did not alter this reality:  "The 'adverseness' necessary to resolving the *removal* question is supplied not by petitioners' claims for the monkeys' protection but rather by petitioners' desire to prosecute their claims in state court."  *Id.* at 78.  *International Primate* therefore recognizes a plaintiff's standing to challenge removal.

We do not dispute that a plaintiff whose case has been removed may challenge that removal—especially when, as in *International Primate*, her case was erroneously dismissed rather than remanded to state court.  But *International Primate* does not allow us to resolve the statutory removability issues once we determine that the plaintiff lacks Article III standing to sue.  We read that case for the modest proposition that a plaintiff has standing to challenge removal, despite a lower court's ruling that she lacks standing for her underlying claims.  But when, as here, the court itself determines that the plaintiff lacks Article III standing, it must remand to the district court with instructions to return the case to state court.  *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.");  *Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1196 (9th Cir. 2016) ("The rule that a removed case in which the plaintiff lacks

Article III standing must be remanded to state court under § 1447(c) applies as well to a case removed pursuant to CAFA as to any other type of removed case."). After all, we have an independent obligation to examine our jurisdiction, and "standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *Baird v. Norton*, 266 F.3d 408, 410 (6th Cir. 2001) (quoting *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231 (1990)). It would defy our duty to decide the statutory removability issues when we conclude that the plaintiff lacks Article III standing. *See id.* ("Because we conclude that [plaintiff] . . . lacks Article III standing to sue, we do not have jurisdiction to consider the other issues raised in this appeal.").

\*\*\*

In sum, Burt lacks Article III standing to proceed in federal court. She does not allege to have suffered a concrete harm, such as a gambling loss, as a result of Playtika's alleged statutory violation. *See TransUnion*, 594 U.S. at 426. She also lacks standing to assert the claims of the players' family members because Tennessee Code Ann. § 29-19-105 is not a qui tam statute. For the reasons articulated here, the three plaintiffs in the other cases lack standing as well.

III.

Because Burt lacks Article III standing, we affirm the district court's order remanding the actions to state court.